The order below is hereby signed.

Signed: September 15 2021



*Elizabeth L. Gunn*
U.S. Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **In re:** <br><br> **Adam Harrison Bryant,** <br> Debtor. | Case No. 19-00292-ELG <br><br> Chapter 7 |
| **Adam Harrison Bryant,** <br> Plaintiff <br><br> v. <br><br> **Educational Credit Management Corp.,** <br> Defendant. | Adv. Pro. No. 19-10012-ELG |

### ORDER GRANTING ECMC'S MOTION FOR SUMMARY JUDGMENT

The issue before the Court is whether the educational loan of the Debtor Adam Harrison Bryant owed to Educational Credit Management Corporation ("ECMC") is dischargeable under the exception to nondischargeability of student loans in 11 U.S.C. § 523(a)(8) as posing an undue hardship on the Debtor. The Debtor and ECMC filed and briefed cross motions for summary judgment, in which each party raised substantially identical arguments. The Court heard consolidated arguments thereon, and in order to provide the Debtor the most favorable inferences of the law and the facts, ruled on ECMC's motion. At the hearing held June 29, 2021, and upon consideration of the evidence and argument on the cross motions in the light most favorable to the

Debtor, the Court orally granted summary judgment in favor of ECMC. This order memorializes the oral findings and rulings of the Court at that hearing.

### Background

*i.   Procedural Background.*

On May 1, 2019, the Debtor, with counsel, filed a petition for relief under Chapter 7 and also *pro se*, a complaint to determine, *inter alia*, the dischargeability of his student loan debt serviced by Nelnet Loan Services as of the filing (the "Complaint").[1] *See* Compl., ECF No. 1. However, under the Family Education Loan Program ("FFELP"), lenders are prohibited from holding interests in student loans that are the subject of an adversary proceeding in bankruptcy. Mot. to Intervene, ECF No. 9, ¶ 4. Consequently, on May 23, 2019, the Debtor's student loan was assigned to ECMC. *Id.* Accordingly, on June 18, 2019, ECMC filed a Motion to Intervene in the Debtor's adversary proceeding as the party defendant because it held all right, title, and interest in the FFELP loan at issue. *Id.* ECMC's Motion to Intervene was granted on June 20, 2019 and ECMC became the named defendant in this adversary proceeding. Order Granting Mot. Intervene, ECF No. 27.

After the conclusion of discovery, the parties filed a joint pretrial statement including each party's list of exhibits and witnesses. *See* Joint Pre-Trial Statement, ECF No. 30. Trial on the Complaint was scheduled to begin on February 24, 2020; however, the trial was continued so that

---

[1] On May 1, 2019, commensurate with the instant Complaint, the Debtor also filed a complaint against AccessLex, Institute, d/b/a Access Group, Adv. Pro. No. 19-10011 seeking substantially similar relief. The Debtor filed a *Motion for Default Judgment*, Adv. Pro. No. 19-10011 (Aug. 9, 2019), ECF No. 20, which motion was stayed pending resolution of this case. The Court will, by separate notice, set that matter for hearing on the default judgment request.

the Debtor could obtain pro bono counsel.[2] Following the continuance, delays associated with the appointment of counsel and the onset of the COVID-19 pandemic prevented the scheduling of any further hearings on the matter indefinitely.[3] The case resumed in October 2020 with the appointment of pro bono counsel for the Debtor.[4] Order Appointing Counsel, ECF No. 44. On March 2, 2021, over a year after the original trial date, the Debtor filed his Motion for Summary Judgment. ECMC responded by filing a Motion to Strike the Debtor's Motion for Summary Judgment, arguing that it was not timely filed. Mot. Strike Debtor's Mot. Dismiss, ECF No. 54. Due to the unique facts and circumstances of this case, including the intervening COVID-19 pandemic, the Court denied the Motion to Strike, and extended the time for ECMC to file its own Motion for Summary Judgment. *See* Am. Sched. Order, ECF No. 63; Order Den. Def.'s Mot. Strike, ECF No. 64. ECMC filed its Motion for Summary Judgment on June 4, 2021 (collectively with Debtor's Motion for Summary Judgment, the "Motions") and the parties fully briefed the cross motions. Arguments on the Motions were heard at a consolidated hearing on June 29, 2021.

---

[2] Under the Court's Local Bankruptcy Rule 2090-4(b)(4), pro se parties in adversary proceedings may file applications for appointment of pro bono counsel. The Debtor filed his application on July 3, 2019. *See* Appl. Counsel, ECF No. 19.

[3] United States District Court for the District of Columbia, Standing Order No. 20-8, *In re Restrictions on Courthouse Visitors* (Mar. 13, 2020).

[4] Pro bono counsel was originally appointed on February 18, 2020, but the appointed attorney ultimately declined the appointment. *See* Order Appointing Counsel, ECF No. 35.

*ii.*     ***Factual Background.*** [5]

Prior to filing bankruptcy, the Debtor accrued student loan debt under the FFELP for higher education costs, including law school. The Parties agree that ECMC is the present holder of the Debtor's consolidated FFELP student loan. As of May 23, 2019, the outstanding principal balance of the loan was $76,649.65, rising to $80,694.33 as of June 2, 2021. At all times during the pendency of this adversary proceeding, the Debtor was in his early 40s, had no dependents, and had no documented illnesses or disabilities, either mental or physical, which impaired his daily life, or affected his ability to work.

After completing his legal education, the Debtor obtained a license to practice law in the Commonwealth of Virginia, was employed as a senior associate at KPMG, LLP, and was making timely payments on his FFELP loan. In July 2008, the Debtor pled guilty to criminal charges in the United States District Court for the District of Columbia, was sentenced to a period of incarceration, and, due to the nature of the offense, his license to practice law was revoked. Joint Pretrial Statement at ¶ 12, ECF No. 30. During the Debtor's incarceration, he promptly arranged with the loan servicer for the FFELP debt to be placed into abatement status. *Id.* at ¶¶ 14-15. After release from incarceration, the Debtor again promptly updated the debt servicer about his situation, change in income, and entered into a repayment agreement with monthly payments lower than the pre-incarceration amount. *Id.* at ¶ 16. The Debtor began making timely payments at this lower rate. *Id.* at ¶ 17. In July 2018, the Debtor applied for and was accepted into an income-driven repayment plan wherein his monthly payment was $0. Debtor's Dep. Oct. 24, 2019, Ex. 3 at 107:19—108:20,

---

[5] In addition to the Statement of Stipulated Facts in the Joint Pretrial Statement (ECF No. 30), the Parties later set forth further undisputed facts which both parties reference in their filings and/or sworn statements (ECF Nos. 48, 66, 68, and 73). The Court incorporates the Stipulated and undisputed facts into this decision.

ECF No. 66. The Debtor has remained in this repayment plan during the pendency of this case and has not failed to make any voluntary loan payments during that same period of time.

Due to the nature of the Debtor's criminal conviction, he was required to register as an offender in the District of Columbia, beginning at the time of his release on February 12, 2011 for a period of ten (10) years through February 18, 2021.[6] Shortly after his release, the Debtor began living in College Park, Maryland, and rented an apartment for $700.00/month. *Id.* at ¶ 21. In September 2014, a change in policy of United States Probation Office for D.C. required the Debtor to relocate into D.C. resulting in a substantial increase in his costs of living. *Id.* at ¶¶ 23-24. The Debtor resided in D.C. until May 15, 2021, with the rent of his last apartment being $1,691.75/month. Def.'s Mot. Summ. J., Ex. 20, ECF No. 66.

After satisfying the terms of his supervised release, in early 2021 the Debtor chose to relocate to San Diego, California. Def.'s Mot. Summ. J., Ex. 6, ECF No. 66. The Debtor's rent in California is $2,025.00/month, including a $50.00/month pet fee incurred after purchasing a Labrador retriever in early 2021 for $1,900.00. Def.'s Mot. Summ. J., Ex. 9, ECF No. 66. In addition to the purchase, the Debtor paid the breeder an additional $2,080.00 to board the dog until he could take possession of it in May 2021. *Id.*

However, the Debtor's voluntary increases in expenses did not start upon his move to California. In June 2020, approximately 7 months before the end of his supervised release, the Debtor purchased a 2019 Ford Mustang. As part of the purchase, the Debtor made a $5,000.00 down payment, and financed the balance through a 72-month automobile loan from Capital One

---

[6] D.C. Code § 22-4002 (2011).

Bank in the amount of $26,835.31, with monthly payments of $467.82. Def.'s Mot. Summ. J., Ex. 18, ECF No. 66. After purchasing the Mustang, the Debtor not only timely made his scheduled monthly payments on the automobile loan, but also paid $14,756.15 in *extra* principal payments in the 11-month period between the time of purchase and May 2021. *Id.*

Some of the Debtor's cost of living increases over time are reflective of his improved income during the same period. After his release, the Debtor found hourly employment as a valet eventually being promoted to a managerial position within the company. Due to his criminal record, the Debtor was hired in an independent contractor capacity "in case a client were to discover [his] criminal record." Debtor's Mot. Summ. J., Ex. A at ¶ 25-26, ECF No. 48. The Debtor had previously worked full-time for the D.C. government (Debtor's Mot. Summ. J., Ex. A at ¶ 29, ECF No. 48), however after six months in this position, the Debtor's criminal history resulted in his termination from the post. *Id.* at ¶ 30. The Debtor was unable to immediately secure a full-time position following his termination and relied on his independent contractor work and family support for income. *Id.* at ¶¶ 31-32.

When the Debtor filed his chapter 7 case he was working as an independent contractor commissioned sales representative in the software industry, Compl. at ¶ 30, ECF No. 1, and his own small business, Strategic Business Resources, LLC, which had contracts with two separate entities, Debtor's Reply in Supp. Mot. Summ. J. at 3, ECF No. 73. One of the LLC's contracts ended and was not renewed in February 2021, with the other still generating around $1,500 per month as of the date of the summary judgment hearing. *Id.* In August 2020, the Debtor began full-time employment with the United States Small Business Administration (SBA) as a Loan Specialist. Debtor's Opp. Def.'s Mot. Summ. J., Ex. B at 14, ECF No. 72. Through all of his

various forms of income, in 2020, the Debtor had a total income of at least $101,051.76, and a total net income of at least $21,561.36. Debtor's Mot. Summ. J. at ¶ 35, ECF No. 48.

## Discussion

### i. *Summary Judgment Standard.*

"A party may move for summary judgement, identifying each claim or defense on which summary judgment is sought." Fed R. Civ. P. 56(a). Summary judgment is appropriate only if the Debtor can show "that there is no genuine dispute as to any material fact and [are] entitled to judgment as a matter of law." *Id*. A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A motion for summary judgment must be read "in the light most favorable to the nonmoving party and the court must draw all reasonable inferences in favor of the nonmoving party." *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011). "If the evidence is such that a reasonably jury could return a verdict for the nonmoving party . . . the summary judgment motion must be denied." *Johnson v. Perez*, 823 F.3d 701, 705 (D.C. Cir. 2016) (citing *Anderson*, 477 U.S. at 248); *see also Brown v. PSI Servs., Inc.*, 736 F. Supp. 2d 234, 236 (D.D.C. 2010) ("the nonmoving party cannot rely on mere speculation or compilation of inferences to defeat a motion for summary judgment.").

The Court evaluates cross motions for summary judgment under the same general standards for summary judgment. *Butler v. Wash. Metro. Area Transit Auth.*, 275 F. Supp. 3d 70, 82 (D.D.C. 2017). To provide the Debtor with the most favorable evaluation of and inferences from the facts and law, the Court first considers the motion for summary judgment filed by the ECMC. Because the Court grants the ECMC's Motion, the Debtor's motion is moot.

    *ii.*        ***Dischargeability of Education Debt.***

The integral issue to the resolution of this case is whether the Debtor may discharge his FFELP student loan debt as an undue hardship pursuant to § 523(a)(8)[7] of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as hereafter amended, the "Bankruptcy Code"). While the bankruptcy discharge is the cornerstone of bankruptcy law, a debtor's entitlement to discharge is not absolute, as evidenced in § 523(a). Specifically, with respect to educational loan debts, § 523(a)(8) provides:

> A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for—
>
> (A)(i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or
>
>    (ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or
>
> (B) any other educational loan that is a qualified education loan . . . incurred by a debtor who is an individual.

11 U.S.C. § 523(a)(8). This exception to the nondischargeability of educational debt creates a presumption that education-related debts are not dischargeable unless there is a clear showing of "undue hardship." *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 281 n.13 (2010) ("[Section] 523(a)(8) renders student loan debt presumptively non-dischargeable 'unless' a determination of undue hardship is made."). It is uncontested that the Debtor's FFELP was an

---

[7] Citations to sections herein shall be to 11 U.S.C. unless otherwise indicated.

"educational loan" as that term is used in § 523(a)(8), and therefore the only question before the Court was whether excluding the loan from the Debtor's discharge would be an undue hardship.

### *iii.  Undue Hardship.*

As both the Debtor and ECMC noted in their briefs and oral argument, there is no controlling authority in this Circuit as to the standard of what constitutes "undue hardship" in the context of § 523(a)(8). However, the Court recognizes and is informed by the two primary standards that have evolved over time in other Circuits. In *Brunner v. New York State Higher Educational Services Corp.*, the Second Circuit developed a three-prong test, now commonly referred to as the "*Brunner* test." 831 F.2d 395 (2d Cir. 1987). The Third, Fourth, Fifth, Sixth, Seventh, and Ninth Circuits have since adopted the *Brunner* test or a substantially similar test.[8] In contrast, the Eighth Circuit adopted a "totality of the circumstances" test, which also involves a separate, but similar three factor analysis. *See Andrews v. South Dakota Student Loan Assistance Corp. (In re Andrews)*, 661 F.2d 702, 704 (8th Cir. 1981). The District of Columbia Circuit has not adopted either standard, and this Court has likewise previously declined to formally adopt either the *Brunner* test or the totality of the circumstances test. *See Zook v. Edfinancial Corp. (In re Zook)*, No. 05-00083, 2009 Bankr. LEXIS 788 (Bankr. D.D.C. Feb. 27, 2009). Because the result under either standard would be the same on the facts and circumstances of this case, the Court does not need to reach the issue of the "appropriate" test to determine whether not

---

[8] *See Pa. Higher Educ. Assistance Agency v. Faish (In re Faish)*, 72 F.3d 298, 306 (3d Cir. 1995); *Educ. Credit Mgmt. Corp. v. Frushour (In re Frushour)*, 433 F.3d 393, 400 (4th Cir. 2005); *U.S. Dep't of Educ. v. Gerhardt (In re Gerhardt)*, 348 F.3d 89, 91 (5th Cir. 2003); *Oyler v. Educ. Credit Mgmt. Corp. (In re Oyler)*, 397 F.3d 382, 385 (6th Cir. 2005); *In re Roberson*, 999 F.2d 1132, 1135 (7th Cir. 1993); *Educ. Credit Mgmt. Corp. v. Mason (In re Mason)*, 464 F.3d 878, 881–82 (9th Cir. 2006).

discharging the Debtor's FFELP loan would be an undue hardship. However, it is instructive to review each standard and its application to the facts herein.

### a. The Brunner Test.

The three parts of the test established by *Brunner* are:

(1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans;

(2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and

(3) that the debtor has made good faith efforts to repay the loans.

*Brunner*, 831 F.2d at 396. The *Brunner* test is a conjunctive test, each part must be proven by a preponderance of the evidence and a debtor must meet each element to be entitled to the discharge of the educational debt in question. *See Educ. Credit Mgmt. Corp. v. Frushour*, 433 F.3d 393, 400 (4th Cir. 2005).

The first *Brunner* element requires the Court conduct a factual analysis of current financial means of a debtor and their standard of living, and to determine if the debtor is both maximizing income and minimizing expenses to a reasonable level. *See Brunner*, 831 F.2d at 396. While this prong does "not require [a debtor to] live in abject poverty," *In Re Faish*, 72 F.3d at 305, "a minimal standard of living under § 523(a)(8) does not equate to a middle class standard of living." *Educ. Credit Mgmt. Corp. v. Howe (In re Howe)*, 319 B.R. 886, 889 (B.A.P. 9th Cir. 2005). The second *Brunner* element requires the Court to prospectively evaluate the circumstances surrounding a debtor's state of affairs and determine if any present hardships indicate a persistent bar to loan repayment likely to continue. *Oyler v. Educ. Credit Mgmt. Corp. (In re Oyler)*, 397 F.3d 382, 386 (6th Cir. 2005). The final *Brunner* prong requires the Court to determine whether

the Debtor has attempted to repay the loan in good faith. *Brunner*, 831 F.2d at 396. This includes considering "whether the debtor has tried to make some payments when he or she could or has sought to defer the loan or renegotiate the repayment plan." *In re Zook*, 2009 Bankr. LEXIS 788 at *31. Additionally, "the good faith portion of the *Brunner* test should consider whether the debtor is acting in good faith in seeking the discharge, or whether he is intentionally creating his hardship." *Educ. Credit Mgmt. Corp. v. Polleys*, 356 F.3d 1302, 1309 (10th Cir. 2004).

### b. *Totality of the Circumstances Test.*

In contrast, the "totality of the circumstances" test is comprised of three non-conjunctive factors that courts should weigh in their analysis of undue hardship:

> (1) the debtor's past, present, and reasonably reliable future financial resources;
>
> (2) a calculation of the debtor's and [their] dependent's reasonable necessary living expenses; and
>
> (3) any other relevant facts and circumstances surrounding each particular bankruptcy case."

*Long v. Educ. Credit Mgmt. Corp. (In re Long)*, 322 F.3d 549, 554 (8th Cir. 2003). While these factors are facially different from the *Brunner* prongs, the totality of the circumstances test utilizes essentially the same general analysis. Stated otherwise:

> [D]istilled to its essence, the finding of undue hardship under § 523(a)(8) following the totality of the circumstances test rests on one basic question: 'Can the debtor now, and in the foreseeable near future, maintain a reasonable, minimal standard of living for the debtor and the debtor's dependents and still afford to make payments on the debtor's student loans?'

*Bronsdon v. Educ. Credit Mgmt. Corp. (In re Bronsdon)*, 435 B.R. 791, 800 (B.A.P. 1st Cir. 2010).

> iv. **The Debtor's Education Debt is Nondischargeable Under Both the Brunner Test and the Totality of the Circumstances Test.**
>
> a. *Brunner Element 1 – Minimal Standard of Living.*

The Debtor, despite his good health, education, and recent financial success, urges the Court to find that he is entitled to the discharge of his student loan debt under § 523(a)(8) as an undue hardship. The Debtor's argument is primarily based on his conclusory assertion that his status as offender who was (and potentially still is in some jurisdictions) subject to registration requirements renders him incapable of maintaining reliable full-time employment, particularly in his chosen profession. In making this argument, however, the Debtor ignores the extensive record indicating that not only is he more than able to provide for his obligations, he has, to his credit, managed to prosper financially, particularly since the filing of his chapter 7 case and this adversary proceeding. Under either test, in order to find that an educational debt is an undue hardship, the Court must find that a debtor *in the foreseeable near future* would not be able to maintain a reasonable, minimal standard of living. *See In re Brondson*, 435 B.R. at 801. While it is true that when the adversary proceeding was originally filed the Debtor had encountered a period of income instability, the evidence since the filing and through the date of the hearing clearly establishes that the Debtor currently, and for the foreseeable future, has and will be able to maintain much more than a minimal standard of living.

It is undisputed by both parties that the Debtor's annual income for the year of 2020 exceeded $101,000, although the parties disagree as to the exact number. Debtor's Mot. Summ. J., Ex. C, ECF No. 48. As of the hearing, the Debtor was currently employed by the SBA as a Loan Specialist at the pay scale of GS-11 and was compensated at a rate of $72,750 per year. ECMC's Mot. Summ. J., Ex. 7, ECF No. 66. Conversely, the federal poverty guideline for a household of

one in 2021 is $12,880,[9] making the Debtor's 2020 income level, at a minimum, almost eight times greater than the federal poverty level as of the date of the hearing. Even discounting any additional income from his LLC or any sources other than the SBA, the Debtor's current yearly salary is over five times greater than the federal poverty level income for a family of one.

There is no categorical standard for what income in relation to the federal poverty level is required to show difficulty in maintaining a minimal standard of living. However, debtors with incomes of three and four times the poverty level have been routinely found to not satisfy the first prong of the *Brunner* test. *See, e.g., Hull v. U.S. Dep't of Educ.*, No. 18-32076, 2021 Bankr. LEXIS 1097 (Bankr. W.D. Ky. Apr. 23, 2021) (finding that a debtor with an income greater than three times the federal poverty guideline for a two-person household failed to satisfy the first prong of the *Brunner* test); *Lewis v. Mass. Higher Educ. Assistance Corp.*, No. 17-51357-KMS, 2020 Bankr. LEXIS 282 (Bankr. S.D. Miss. Jan. 29, 2020) (a debtor with an income greater than four times the federal poverty guideline failed to satisfy the first prong of the *Brunner* test). Additionally, when the Court considers that the Debtor's own records indicate a net income of over $20,000[10] after deducting expenses, and the Debtor's standard of living increase with his May 2021 voluntary relocation to California, even the most charitable view of the facts does not support the Debtor's argument that he cannot maintain a minimal standard of living. Debtor's Mot. Summ. J. at ¶ 35, ECF No. 48. Therefore, the Debtor fails the first prong of the *Brunner* test.

---

[9]. Assistant Sec'y for Plan. & Evaluation, *2021 Poverty Guidelines*, HHS, Jan. 26, 2021, https://aspe hhs.gov/2021-poverty-guidelines.

[10]. In addition to the $20,000, the Debtor also has at his disposal the income of his solely owned LLC.

b. *Brunner Element 2 – Situation will Persist for a Significant Time.*

The Debtor argued that his status as an offender precluded (and may continue to preclude) him from attaining and maintaining steady full-time employment in his preferred profession(s). While the Debtor clearly faced challenges in the past related to securing employment within his preferred profession(s), the evidence does not support a finding of current or future financial instability. As of the date of the hearing, the Debtor had maintained full-time employment with the SBA for almost a year. Even though the Debtor's employment in this position was listed as a "temporary appointment" and could possibly cease if the SBA deems the role no longer necessary, the SBA has multiple loan programs for disaster assistance, including a COVID-19 Economic Injury Disaster Loan with an extended the application deadline through December 31, 2021.[11] Further, the *Brunner* test does not require evidence of guaranteed and/or continued employment, but rather the opposite – whether present hardships present a persistent bar to current and future employment and repayment. Even when considered in the light most favorable to the Debtor, there is no evidence to indicate the Debtor's position will be terminated in the near future, nor that even if it were, the Debtor would be unable to find other employment. Indeed, the Debtor himself notes that the renewal period of his employment began on a 30-day interval but has since been changed to a 60-day interval. Given the Debtor's extended employment with the SBA and termination of his D.C. offender registration requirements, the Court finds that there is not a persistent bar to repayment under the second *Brunner* prong.

---

[11] *SBA Reaches $200 Billion Milestone in Economic Injury Disaster Loan Program to Small Businesses and Non-Profits*, SBA, Feb. 12, 2021, https://www.sba.gov/article/2021/feb/12/sba-reaches-200-billion-milestone-economic-injury-disaster-loan-program-small-businesses-non-profits.

The Debtor's heavy reliance on *Zook v. Edfinancial Corp.* further undermines his position and, in fact, demonstrates his inability to meet the second prong of the *Brunner* test. *Zook*, 2009 Bankr. LEXIS 788 at *27-31. In *Zook*, the debtor suffered from severe depression and bipolar disorder, both of which are persistent, incurable, and debilitating mental health disorders profoundly impacting an individual's daily life. *Id.* at *6–*8. The Debtor here has indicated no comparable issues with his health, either mental or physical, which prevent him from maintaining a job, relying only on his conviction, related status, and registration requirements. The Debtor's own history shows he was able to secure and maintain multiple jobs post-conviction.

The Debtor instead argues that his status as an offender is a permanent hinderance to his ability to obtain stable full-time employment, especially in his chosen profession. Offender registration requirements are fundamentally different than persistent, ongoing mental or physical illness. Further, documentation from the District of Columbia indicates that the Debtor is no longer required to register in this jurisdiction, as he has satisfied the ten (10) year registration period required by the law of the District. Def.'s Mot. Summ. J., Ex. 4, ECF No. 67. Additionally, prior to moving, the Debtor determined that the registration period in Maryland is 15 years,[12] and that under a new law in California, he has the possibility to unregister, and until that time, he should not be listed on the public notification website. Debtor's Dep. Oct. 24, 2019, Ex. 3 at 116:15–16,

---

[12] The website of the Maryland Department of Public Safety and Correctional Services (DPSCS) provides information on registration period requirements; Tier I offenders are required to register for 15 years. *Sex Offender Registry FAQs*, M.D. DPSCS, https://www.dpscs.state.md.us/onlineservs/sor/frequently_asked_questions.shtml (last visited Sept. 14, 2021).

ECF No. 66; Debtor's Dep. May 21, 2021, Ex. 5 at 26:9–28:19, ECF No. 68.[13] In short, in this case, the Debtor's conduct and the passage of time has actually mitigated the most limiting aspects of his conviction. Accordingly, it does not rise to the level of persistence for a significant period of time as required by *Brunner*.[14] Thus, the Debtor does not satisfy the second prong of the *Brunner* test.

    c. *Brunner Element 3 – Debtor's Good Faith Efforts to Repay.*

The final element under *Brunner* is whether the Debtor is seeking a discharge of his student loan in good faith. ECMC does not argue that the Debtor's Chapter 7 was not filed in good faith, and instead argues that the Debtor's reliance on his prior criminal conviction in support of discharge of the loan is not in good faith. A split exists amongst bankruptcy courts as to whether a debtor's conviction precludes a finding of good faith in an undue hardship analysis. *Compare Chenault v. Great Lakes Higher Educ. Corp. (In re Chenault)*, 586 B.R. 414, 421 (6th Cir. BAP 2018) (finding a debtor's criminal conviction prohibits a good faith determination under *Brunner* because his incarceration was a condition "of his own making"), *with Harvey v. Educ. Credit Mgmt. Corp.*, 2013 Bankr. LEXIS 3379 at *12 (Bankr. Colo. Aug. 20, 2013) (holding that a debtor's criminal convictions did not preclude a finding of good faith). The Court does not have to reach the issue of the impact of whether the Debtor's criminal conviction necessarily precludes

---

[13] As of January 1, 2021, California has a adopted a three-tier system for offender registration, with Tier I offenders being required to register for a minimum of ten years. *See* Cal. Penal Code § 290(d)(1). Additionally, the Court conducted a brief search on California's offender website and Debtor's name did not appear.

[14] The Bankruptcy Court for the Northern District of Illinois's holding in *Promisco v. United States Dept. of Education (In re Promisco)*, is also instructive. 625 B.R. 715 (Bankr. N.D. Ill. 2021). The Debtor in *Promisco* obtained two successive full-time jobs, notwithstanding his prior felony convictions, demonstrated his employability, and therefore the Court found he failed to show the criminal convictions were an exceptional circumstance that would render him unable to pay for the entire period of his student loans. *Id.* at 729. In the instant case, this Court can only conclude this Debtor currently does and will in the future have the ability to continue paying on the debt.

a finding of good faith and specifically declines to adopt either approach. There are more than sufficient other facts in this case that convince the Court the Debtor fails to satisfy this prong.[15]

First, in June 2020, the Debtor purchased a 2019 Ford Mustang with a $5,000.00 down payment and financed the remaining $26,835.31. While the Debtor has the freedom to choose which type of vehicle he purchases, a Mustang is not the most economical of vehicles, either in initial price, costs of use, repair, maintenance, or insurance. The Debtor did not provide any evidence or argument to justify or explain the purchase of a high-end vehicle instead of a more economical vehicle.

Further, since the purchase of the vehicle, the Debtor has timely made his monthly vehicle loan payments of $467.82. Moreover, instead of merely making his minimum monthly car payments, the Debtor chose to aggressively pay down the vehicle loan by making $14,756.15 in <u>extra</u> principal payments between July 2020 and May 2021. Debtor's Dep. May 21, 2021, Ex. 5 at 44:17–45:17, ECF No. 68. The Court finds the Debtor's explanation for such aggressive payments – to pay off the car in order to have a place to live if he could not pay rent for an apartment – unpersuasive to overcome the implied lack of good faith with respect to his FFELP loan. Based on a basic 30-year repayment plan which ECMC offers, the Debtor's monthly loan payment would be approximately $325.00. At that rate, the $14,756.15 in excess principal payments on the vehicle would have covered over 45 months of payments, or almost four years, on his loan to ECMC.

---

[15] Furthermore, reliance solely on a criminal conviction is inconsistent with the "paramount objective of the corrections system," namely the "rehabilitation" of "offenders [who] will eventually return to society." *Pell v. Procunier*, 417 U.S. 817, 823 (1974).

Def.'s Mot. Summ. J. at ¶ 47, ECF No. 66.[16] Instead, the Debtor made no payments to ECMC over the same period.

In addition to purchasing the Mustang, in early 2021 the Debtor purchased a purebred Labrador retriever from a specialty breeder at a price of $1,900, then spent an additional $2,080 to board the dog pending his move to California, and purchased a $1,802 necklace for a "friend." Debtor's Dep. May 21, 2021, Ex. 5 at 58:6–59:14, 64:3–65:12, ECF No. 68. During that same period, the Debtor did not make any payments to ECMC. While the Court sympathizes with the desire for animal companionship, spending nearly $4,000 to purchase and board a purebred dog is hardly indicative of an attempt to minimize expenses in good faith.[17] The Debtor's explanation that he was looking for a "strong companion and loving animal" does not overcome the implied lack of good faith in this situation, particularly when there are many loving companions awaiting adoption at local shelters for minimal adoption fees. Debtor's Opp. Def.'s Mot. Summ. J., Ex. A at ¶ 17, ECF No. 72.[18] Finally, purchasing expensive gifts such as the necklace while not making loan payments is counterintuitive to a finding of a that the Debtor is maintaining a minimal standard of living and making a good faith effort to repay his student loan. The standard requires that despite all efforts, a debtor still does not have any money remaining to pay towards their student loans. That is clearly not the situation in this case. For all of these reasons, the Court finds that the Debtor fails to satisfy the third prong of the *Brunner* test.

---

[16] Alternatively, under a 25-year repayment plan, the monthly payment would be $384, and the excess principal payments would have covered over 38 months, or over three years of payments.

[17] Not to mention that ownership of the dog will not be limited to the purchase price, but will include ongoing additional costs for food, grooming, veterinary care, and an additional $50 per month "pet fee" on his apartment lease.

[18] The Court also questions how the Debtor would live out of his Ford Mustang with a fully grown Labrador retriever.

    *d. The Totality of the Circumstances Test.*

Much of the analysis of the *Brunner* prongs is also relevant to the totality of the circumstances elements. As discussed above, the record indicates that while the Debtor did previously have issues obtaining long-term employment, he is now financially stable and able to maintain a more than minimal, comfortable lifestyle. The Debtor's income for the year 2020 was greater than $101,000, and he has no dependents or exceptional non-luxury financial obligations. Debtor's Mot. Summ. J., Ex. C, ECF No. 48. As for "any other relevant facts and circumstances," the only abnormal aspect of the Debtor's petition is his criminal conviction. However, despite this obstacle, the Debtor has been able to prosper financially, secure professional employment, and engage in a greater than "minimal" level of lifestyle. The Debtor's current standard of living clearly negates any weight this factor would otherwise afford. Thus, the Debtor has not sufficiently proven that he meets the requirements of showing "undue hardship" and his student loan debts cannot be rendered dischargeable.

## **Conclusion**

Under either the *Brunner* or the totality of the circumstances test, the facts clearly establish that the Debtor now, and in the foreseeable near future, has the ability to maintain a reasonable, minimal standard of living, and that making payments on the FFELP student loan will not be an undue hardship. Based upon the foregoing, the Court finds that the Debtor does not meet the requirements under § 523(a)(8) and his debt is nondischargeable. Thus, the Court grants ECMC's Motion for Summary Judgment, and denies the Debtor's Motion for Summary Judgment as moot.

[Signed and dated above]

Copies to: recipients of electronic notice.